The opinion of the Court was delivered by
Mr. Justice Nott.
1st. The first ground taken for a new trial in this case is, that there is no evidence of a conversion. But as that ground has not been insisted on in the argument, I presume it may be considered as abandoned.
2d. The second is, that the deed under which the plaintiffs claimed, was not supported by any legal consideration. The deed purports to be “ in consideration of love and good-will,” and for divers other good considerations. Judge Blaelcstons says, that every deed, from the solemnity of the seal, is presumed to be for a good consideration ; and admitting that love and good will are not a good consideration for a conveyance to a stranger, yet as these words express nothing immoral, the deed may be considered as voluntary and good between the parties.
3d. The third ground which 1 shall consider, (though not the third in the order of the brief,) is, that the assent of the husband cannot be presumed, and without it the deed conveyed nothing to !.h. wife.
Th ■ Ned to the wife was good, unless the husband dissented; but if his assent was neces-> *281 »ary, it will be presumed in a case so much for her benefit. But, from the situation of these parties, it is unnecessary to consider that question, as will appear from the view taken of the next ground, to wit, that if the deed had any effect, it vested the property in the husband, and not in the wife.
This may be a question of some importance, though perhaps not necessary to be decided in this place. Judge Reeve, in his Treatise on Domestic Relations, says, that personal chattels accruing to the wife during coverture, vest immediately in the husband, and to this effect quotes 1 Comyn's Dig. 555. Reeve, 61.
This learned author, however, admits that there are authorities which hold that the right is not vested in the husband, until he has reduced the goods into possession, and acknowledges that the latter is the established doctrine of the Court of Equity, and that it still remains to be ascertained how the question will be ultimately settled by the Courts of this country. He also says he is inclined to adopt the doctrine laid down by Comyn, because it preserves the symmetry of the law. But I should consider it one step gained towards preserving the symmetry of the law, to effect an uniformity of decision between the Courts of Law and Equity., And I am disposed to think, that the prevailing opinion in this state, even in the Courts of Law, has been in conformity with the decisions of the Courts of *282 Equity. It is not, however, necessary to determine the question in this case; for the husband ,. , it n -it* • r> i having deserted and abandoned his wite, may be as it is expressed in England, as having abjured the realm;- in which case the wife may be looked upon as Si feme sole. Indeed, irom J -* * the length of time which he had been absent, and . , . 1 • i s*i • no certain accounts having been received of him from the time of his departure, the Jury might fairly presume that he was dead at the time the deed was made; for he had then been absent, according to the testimony of one witness, at least five or six years, and twenty-five or six when this action was tried. But the last and most important ground relied on, is, that the deed was founded on an immoral consideration, and therefore ought not to he supported in a Court of law. The consideration here spoken of, is cohabitation with the plaintiff’s wife, then Mrs. Pillcerton. This fact is inferred from the consideration expressed in the deed, “ love and good will,” while she was still the wife of another man. But I can easily suppose a person may entertain such a friendship (or love and good will) for a married woman, and particularly one abandoned and forsaken, as this unfortunate woman was, as to induce him to give her a small portion of his property, without considering it as irresistible evidence of illegitimate love; and much less would I consider such an expression by an ignorant maii, who perhaps thought it necessary to ex *283 press some consideration, sufficient to destroy the reputation of a virtuous woman. For whatever might have been the real character of this woman, I think we are bound to suppose her such, while we are considering the subject with reference to the deed only; and I do not think a contrary presumption is very much strengthened by the extrinsic evidence.
abandons garded as a fme sole; and he may £e dead,11 "after*a long absence, and »otheard or.
*283 Mrs. Pilkerton says, Daniel White used to visit Mrs. Cusack, (then Mrs. Pilkerton,) but she does not know the object of his visits.
Drury Pilkerton says, that White desired him to ask her if she would receive his visits; he did so, and she did not object, that is, she made no reply. The testimony of the first witness proves nothing; that of the second but little: if it proves any thing, it is so extraordinary that I think it not entitled to much weight. If Mrs. Pilkerton had been a notorious strumpet, there would have been no necessity for sending an ambassador to negotiate such a treaty. If she was a woman- of previous good character, he would hardly have adopted that method to seduce her. But he does not explain for what purpose he wished to visit her; and, after all, he only made the proposition, and she made no reply. I suppose he took silence for consent, and that is now to be received as plenary proof of an illicit intercourse between them. I do not feel authorized to give such a construction to the testimony.
But suppose the fact of cohabitation to be *284 clearly proved, would the conclusion follow which has been drawn from it ? In order 'to determine that question, it is necessary to inquire what the Common Law was, and whether any, and what, alteration has been made by our act on the subject ? The text on which the whole doctrine contended for is predicated, is, that ex turpi contractu non oritur actio. If we were now for the first time called upon to determine what degree of turpitude should render a contract void, and to settle all the distinctions to which such a maxim might give rise, we should have a task of no small difficulty to perform. But it appears to me that the law is so well settled, there is little left for us to do. Whether wisely settled or not, is not for me to determine; the law must be our guide.
1st. I take it to be clear law at this day, that a contract made in consideration of future cohabitation is absolutely void. (3 Burrow, 1568. Walker vs. Perkins.) The law will not permit a woman to make her virture an article of merchandise. Such gross indecency and immorality contaminates the very source and foundation of the contract, and renders it void from the beginning. In the case of Walker and Perkins, the consideration was expressed on the face of the deed. Whether it would be permitted to aver such a consideration contrary to the dee d, does not appear.
2d. I take it to be as clearly settled, on the *285 other hand, that where a bond or deed is given for past cohabitation, it is good. (Turner vs. Vaughan, 2 Willson, 339.) In that case also, the consideration was expressed in the condition of " the bond, and the Judges all agreed that it was a good and meritorious consideration. The reason is, because where a woman has been seduced, her reputation destroyed, and herself exiled from the company and society of all the respectable part of the community, she is entitled to some compensation or reparation for the injury, from the author of her ruin. She is not considered guiltless in a moral point of view; but the law will not on that account prohibit the person who has caused, or, perhaps, has only contributed, to her misfortune, from doing her that justice to which he may consider her entitled. The turpitude is in the act, and not in the compensation.
3d. But a third, and perhaps the most numerous class of cases is, where a bond or other deed is given to a woman, while living in adultery with the man who makes the deed, without expressing the consideration for which it was given, or purporting to be for a good and valuable consideration. And here I think I may lay down another rule, that such a deed is always to be taken as good at law. For where a deed purports to be for a good consideration, the contrary is never to be presumed. The mere fact of living together would not prove that cohabitation *286 was the consideration: and if that fact was proV- # J * ed, it would still remain to be shown that it was ^ future cohabitation. Both these facts must be pr0ved; they are not to be presumed. There is all the difference between a deed made during cohabitation, and one made in consideration of future cohabitation, that there is between a good and void deed.
All the cases which have been relied on by the defendant’s counsel are taken from the equity books; but sitting in a Court of Law, we must be governed by the rule of law, and not of equity. The Courts of Equity have this advantage over a Court of Law, that although they recognise the rules before laid down, yet when a party comes into that Court to enforce the specific performance of such a contract, they will be governed by the particular circumstances of the case - and in many cases where they will not lend their aid to carry the contract into effect, they will not set it aside. Yet the Courts of Equity, with the unlimited discretion they exercise, have never gone so far as is contended for in this case. Two great considerations with the Courts of Equity are, 1st. Whether the cohabitation was with a married or a single man: 2d. Whether the woman was previously virtuous, and had been seduced. The argument, or reasoning, in the Court of Equity, is: if the cohabitation was with a single man, there is reason to presume the woman may have been seduced by a promise of *287 marriage; but she can have no such expectation from a married man. If she was a common wo_ i man before the unlawful intercourse commenced, she has sustained no injury, and, therefore, entitled to no reparation. But although these may be considerations with the Courts of Equity, they are not subjects of inquiry for Courts of Law; and even in the Courts of Equity, I believe I am authorized to say, these are only considerations by which their discretion will be directed, and not rules of law, by which their decisions are always governed. In the case of Lady Cox, (3d P. Williams, 340,) the master of the rolls said, it was reasonable to presume the bond was given to induce her to continue to live with him; in which case it was worse than a voluntary bond. He, therefore, postponed it to simple contracts, debts; but he did not set it aside ; and that was a bond given by a married man, and the woman knew it when the bond was given. In the case of the Marchioness of Annandale v. Ann Harris, where a bill was brought to have the bond delivered up, and where there was also a cross bill for performance (2d. P. Williams, 432,) the bond was decreed to be paid. Indeed, in none of the cases produced, even from the equity books, have the bonds been decreed to be given up, or deeds set aside; but the Courts have merely refused their aid to carry them into effect.
Having thus cursorily noticed the general *288 rules by which Courts of Law and Equity' are governed in eases of this sort, let us now apply them to the case under consideration.
The most that can be made of this case is, that the deed was made during cohabitation; but it was not proved to have been made in consideration of cohabitation. On the contrary,. Pillcerton says, the proposition which he was authorized to make, and which laid the foundation for the criminal intercourse that afterwards took place, if it ever did exist, was some time after the deed was executed. No case can be found where such a deed, on such evidence, has been set aside, or held void. I will not protract this opinion by pointing out the endless variety of cases where every principle of honour, law, and morality, requires such provision to be made for an unfortunate woman, and more unfortunate offspring. But,! will suppose a woman abandoned to-vice, and reduced to the lowest degree of degradation; is she, on that account, to be abandoned to misery and distress; to be turned out upon the world, poor, wretched, and naked; to depend on charity, or the bounty of the state, for support ? May not the author of her wretchedness, or he who has participated in her vices, relieve her from penury and want ? Ought he not to be compelled to do it ? And surely when he does voluntarily, what every person would say he was bound, by every principle of morality and religion to do, and what, otherwise, the state would, *289 perhaps, be obliged to do, the law, will not declare the act void. In Equity, the previous character will be sometimes inquired into. But in the case of Hill vs. Spencer, (Ambler, 641,) Lord Camden said, there was no principle in Equity which said a man may not give a voluntary bond to a common prostitute. The woman, in that case, was proved to have been a common prostitute for seven years before her acquaintance with the obligor, and continued so during her criminal intercourse with him; yet the Lord Chancellor would not relieve against the bond, nor order it to be given up. I think it results from all those cases, that, without any discrimination, if there has been no fraud, the only case where such a bond or deed is held to be void at law, is where it is given for future cohabitation, and clearly proved to be so.
I have given this subject more attention than the particular case before us required, with a view to the construction of our own act, which is now to be considered. And even that would not. have rendered it necessary, but for the opinion which it is said was advanced by the presiding Judge in this case, and similar opinions by other members of this bench on a former occasion. For although there is no ground made in this case of misdirection, yet it is of the first importance that we avail ourselves of the earliest opportunity to re-consider opinions hastily deliver *290 ed, and correct those which are calculated to mislead the public mind with regard to the law. It is said that the Judge, on the circuit, instructed the Jury, that the deed in question was void' at Common Law; but that it was good' under our act of Assembly, which had in that respect repealed the Common Law. I hope I have satisfactorily shown that it was not void at Common Law, and Í will now proceed to consider our act, which is alluded to. The act is in these words: “ If any person, who is an inhabitant of this State, or who has an estate therein, shall have already begotten, or shall hereafter beget, any bastard child or children, or shall live in adultery with a woman,, the said person having a wife or lawful children of his own, living, and give, or settle, or convey, either in trust, or by direct conveyance, by deed of gift, legacy, devise, or by any other way or means whatsoever, for the use and benefit of said woman with whom he lives in adultery, or of his bastard child, or children, any larger or greater portion of the clear value of his estate, real or personal after payment of his debts, than one-fourth part thereof, such deed of gift, conveyance, legacy, or devise, made or hereafter to be made, shall be, and the same is hereby declared to be null and void, for so “much of the amount or value thereof, as shall or may exceed such fourth part of his real and personal estate.” (1 Brevard, 68.) I should not consider this act as going to give vali *291 dity to contracts, bottomed on a base and immoral consideration, which were void at Common Law. t But it certainly recognises, in very strong and explicit language, the principles which I have endeavouring to establish, that, a bond or deed, given even by a married man, to a woman with whom he is living in adultery, was notvoid atCommon Law. It assumes the principle, that he had a right thus to dispose of his property, and goes to restrain the abuse of it. It is not the intention or the effect of the law, to encourage vice and immorality, or to legalize corruption. It recog.nises a right, in every man, to make reparation to injured innocence, or injured reputation. It considers every man as a free agent, having the disposition of his own property. It does not confer on married men the exclusive privilege of keeping mistresses. On the contrary, when one becomes so forgetful of the duty which he owes to himself, to society, and his family, it prohibits him from giving the whole of his property to such a woman, in exclusion of his wife and children; a privilege in which he was not restrained by the Common Law; and leaves him nevertheless to judge whether the object of his criminal intercourse ought not also to be the object of his bounty; and to determine, within certain restrictions, of the nature and extent of the compensafion which she deserves. And although it will sometimes happen, that a portion of a man’s pro *292 perty will be taken from a virtuous wife, and an amiable family of children, to support a dissolute and profligate mistress, yet the rules of law must be uniform.
In this country, where divorces are not allowed, for any cause whatever, we some-' times see men of excellent characters, unfortunate in their marriages; and virtuous women abandoned, or driven away houseless, by their husbands, who would be doomed to celibacy and solitude, if they did not form connexions which the law does not allow, and who make excellent husbands and virtuous wives still. Yet they are considered as living in adultery, because a rigorous and unyielding law, from motives of policy alone, has ordained it so. The infinite variety of shades by which the different cases may be distinguished, renders it impossible to lay down any definite rules for considering them. In Equity, from the peculiar construction of that Court, perhaps some discrimination may be made; but I doubt very much, whether greater justice will be done than at Law. It is not because a woman has forsaken the paths of virtue, that she is to be abandoned and forsaken. The first woman that was made, who came pure and spotless from her Maker’s hand, was the victim of seduction; but she was still provided for. And the law looks with that indulgence on the frailties of human *293 nature, as not to consider every error an unpardonable crime.
I am of opinion a new trial ought not to be granted.
Grimké, Colcock, Gantt, Ch'eves, and Johnson, J. concurred.